(No. 12647.—Decree affirmed.)
FRANCIS J. CRIST, Appellee, vs. GILBERT McCOY et al.—
(ROBBIE M. SMITH, Appellant.)

*Opinion filed April 15, 1919.*

1. JUDICIAL SALES—*the chancellor may exercise discretion in approving master's sales.* The chancellor has a broad discretion in the matter of approving or disapproving a master's sale made subject to the court's approval by the terms of the decree, but such discretion is not arbitrary and must be exercised according to law.

2. SAME—*judicial sales will not be set aside for mere informalities or irregularities.* Public policy requires stability in all judicial sales in order that the property may bring its full value, and such a sale will not, as a rule, be set aside for mere informalities or irregularities or for causes which the parties complaining might with a reasonable degree of diligence have avoided.

APPEAL from the Circuit Court of Pope county; the Hon. A. W. LEWIS, Judge, presiding.

GEORGE B. GILLESPIE, for appellant.

CHARLES DURFEE, (H. A. EVANS, of counsel,) for appellee.

Mr. CHIEF JUSTICE DUNCAN delivered the opinion of the court:

Robbie M. Smith, one of the defendants in a suit for the partition of real estate, has appealed from an order of the circuit court of the county of Pope overruling her exceptions to the master's report of sale and the approval of the same.

The various exceptions of appellant question the fairness and legality of the master's sale on the ground that he refused to entertain her bid on the property *en masse* after it had been offered and bids had been received thereon in separate lots and tracts. The specific claim made and argued by appellant is, that when the property was offered for sale *en masse* the offer was made in a very low tone of

287 — 41

voice,—so low that it was not heard by her agent, Noah Gullett, who was there for the express purpose of bidding on it as a whole for her and who stood within twenty feet of the auctioneer; that after the sale was declared closed he informed the master that he did not hear the property offered for sale *en masse* and offered further bids for the property as a whole, but the master would not consider them.

The undisputed facts proved on the hearing of the objections are the following: A decree for partition had been rendered, commissioners were appointed and a report·was made by them that the property was not susceptible of division or partition without manifest prejudice to the rights of the parties in interest, and the aggregate value of the property was fixed at $45,000, and the court approved the report and decreed a sale. The property was also appraised in separate lots and tracts, and consisted of lands, town lots and a ferry franchise. The aggregate of the appraisement of the lands was $35,240, the lots $9575 and the ferry franchise $185. At the sale on June 24, 1918, which was duly advertised, the aggregate of the separate and other bids on the lands was $32,685, on the lots $8893.16 and on the ferry franchise $160, making the aggregate of the bids on the separate classes of property $41,738.16, or $3261.84 less than the entire appraised value. Appellant employed Noah Gullett, an attorney at law, to attend the sale as her agent, and instructed him to bid for her on the property *en masse* an amount sufficient to purchase the same, not exceeding $45,000, and supplied him with funds amply sufficient for him to comply with the decree of sale in case she through him became the purchaser, and he attended the sale for that purpose and was present during the entire sale. The sale was advertised to take place at the north door of the court house in Golconda and to begin at the hour of ten o'clock A. M. Hon. William P. Sloan, who was an attorney at law, was the master in chan-

cery. He was near seventy-four years of age and in such an enfeebled condition physically that he felt that he was unable to personally cry a sale of that magnitude, as there were more than eighty tracts and lots for sale and the sale would in all probability require the entire day to complete it. For these reasons he called upon John Browning, who had served theretofore for many years as master in chancery and who was the attorney for the complainant in the partition suit, to cry the sale, and the sale was cried by him in the presence of and at the directions of the master in chancery, and the master remained very near the crier and made memoranda of every sale as the sales proceeded. No objections whatever were made to Browning acting as crier. The sale began promptly at the hour and place advertised and continued until the noon meal. The sale continued in the afternoon at the same place until about two o'clock, when it began to rain. All parties present then proceeded to the hall of the court house, just south of the north door, at the direction of the master, where an attempt was made to continue the sale, but the crowd was so large and the noise thereof so great that at the suggestion of Browning they all went to the court room on the second floor of the court house and the sale was there continued until it quit raining, when at the direction of the master in chancery the sale, upon sufficient notice to all present, was finished in the yard just north of the court house door. Up to this time the lands and lots had been offered for sale in separate tracts and bids made thereon, and the crier of the sale had announced that he would make any combination of lands, or of lands and lots, or of the lands, lots and ferry franchise, desired and requested by any bidder, and certain combinations were requested by one or more bidders, and purchases were thus made by bidders bidding more than the aggregate of the separate bids for the parcels included in the combinations offered. It was then announced that the sale would be completed in the

court yard at the north door of the court house, where the lands would be offered as a whole, and then the lots as a whole, and then the lands and the lots, and finally the lands, lots and the franchise would be offered for sale *en masse*. All parties then proceeded to the court house yard just north of the door, and the lands, lots and franchise were offered for sale as a whole and *en masse,* as was announced in the court room, and no other bid being received, the crier announced each time that no bid had been received, and finally that none had been offered for the real estate *en masse,* and announced the sale closed and that the parties making the previous best bids were the purchasers, etc. When the lands were offered for sale as a whole the total amount of the separate bids thereon was announced and that the total price would have to be exceeded by a bid before such a bid could be entertained. A similar announcement was made when the lots were offered as a whole, and also when the lands and lots as a whole were offered for sale, and the same thing was done in the same way when the entire property *en masse* was offered for sale.

H. A. Evans, an attorney at law of Metropolis, who was at the sale in the interest of one of the heirs and who was employed and instructed to watch the sale and to see that it was regularly and properly conducted, and who was instructed to bid $40,000 for all the property *en masse* for his client in case it did not bring that much, testified very positively to facts showing that the sale was conducted regularly and properly throughout and that he was present all the time and watched it closely. After testifying that the crier announced to the crowd the aggregate of the bids that had been made for each class of property and the aggregate of the bids upon all the property as a whole, after the final adjournment from the court room to the court house yard to finish the sale, and that he announced each time that a bid to be received must exceed those amounts, and that he offered the property for sale after such an-

nouncements, he continues his testimony in this language:
"He (Browning) made the announcements fair and square,
and he waited, and he waited properly, and no bids came.
He did that at least four times. He did that when he
offered the town property, and when he offered the country
property, and when he offered the ferry franchise, and he
did it when he offered all of it, including the franchise. I
did not regard it in a low tone. It was not in a wild, loud
tone, but so everybody could have heard it." He did not
bid at the sale because the property had sold for more than
his client had authorized him to bid at the sale *en masse.*
Evans was not an interested party in bidding, except to see
the sale was properly conducted and the property brought
as much at the sale, or more, than his client was willing
to give for it. His interests were certainly not adverse to
appellant or to any other of the heirs who were interested
in a proper sale. Evans was corroborated in his testimony
that it was a fair and properly conducted sale by the mas-
ter in chancery, who was not interested in the sale except
to see that it was properly conducted and for the best price
obtainable, and he was also corroborated by Browning, the
crier of the sale, who was not interested in the sale as
a purchaser or otherwise, except to see that the property
brought a fair and adequate price, as is shown by his tes-
timony. These witnesses all thoroughly understood what
was required to make the sale a valid sale and would readily
note any mis-step in crying the sale. Besides these wit-
nesses there were six other witnesses for the appellee who
testified that they heard all the property offered for sale
*en masse* in a voice a little louder than the ordinary tone
of speaking and sufficiently loud for it to be heard by
them, and their testimony generally was, in substance, that
it could have been heard by all parties within a radius of
forty feet from the crier. Some of these witnesses also tes-
tified that he dwelt on the final sale of all the lands *en masse*
two and one-half or three minutes before closing the sale.

Only four witnesses testified for appellant, and two of them corroborated appellee's witnesses in their testimony that all the property was offered for sale *en masse* after the classes of the same had been offered as a whole. Noah Gullett, the attorney and agent for appellant, testified, in substance, that he was present throughout the sale; that he heard the town property as a whole offered for sale by the auctioneer and heard the land as a whole offered for sale, but that he did not hear all the property,—the town lots, the lands and the ferry franchise,—offered for sale as a whole; that he was about twenty feet from the auctioneer when the sale was closed, and he thinks he could have heard the offer of all the property *en masse* for sale if it had been made by the auctioneer. He also testified that when he learned the sale was closed he rushed up to the crier and the master and informed them that he did not hear the property offered for sale *en masse* and wanted to make a further bid on such sale, and that he first offered to bid $41,739, then $41,750, and finally offered to bid $41,800 for all the property, but that the master told him that the sale had been closed and that he could not entertain his bid, as he had no right to do so. One other witness for appellant, H. V. Hesselman, testified that he was close to Gullett when the sale closed; that he heard the auctioneer offer the town property in a lump but did not hear him offer the entire property *en masse* for sale. He was not a prospective purchaser, did not bid on the property, and was not interested in any of the bids according to his testimony. He also testified that he was not interested enough to watch many of the details of the sale, and was about twenty-five feet from the crier when the sale was closed.

The weight of the evidence is to the effect that the sale was fairly and properly conducted and regularly cried in a sufficiently loud tone for all parties present to have heard the announcements of the crier who were interested and

who were giving their undivided attention to the sale. Gullett, although he testified that he was attentive at the critical moment when the lands were offered for sale *en masse* and did not hear any such offer of sale made, must have had his mind distracted from the sale or must have been mistaken as to just what offer of sale the master was crying when the lands were offered *en masse* and for no fault· on the part of Browning or the master in chancery. We cannot understand from this evidence how it could have been otherwise.

There is no fraud or collusion shown on the part of any of the purchasers at this sale by reason of any agreement or understanding to not compete against one another. There was no fraud proved of any kind upon the part of any person, and under the evidence we do not feel that we can do otherwise than affirm the order and the judgment of the circuit court. It is not contended that the sales are invalid for want of adequate consideration. The chancellor has a broad, but not an arbitrary, discretion in the matter of approving or disapproving a master's sale made subject to the court's approval by the terms of the decree. Such discretion must be exercised according to rules of law. (*Quigley* v. *Breckenridge,* 180 Ill. 627.) Public policy requires stability in all judicial sales and that they should not be disturbed for slight causes, otherwise property could not be expected to bring its full value at such sales. Such a sale will not, as a rule, be set aside for mere informalities or irregularities or for causes which the parties complaining might with a reasonable degree of diligence have avoided. (24 Cyc. 38; *Barling* v. *Peters,* 134 Ill. 606.) There were only about twenty-five persons at the sale when it closed. It appears that Gullett was about the same distance from the crier of the sale when it closed as was Evans; that all of the final announcements and crying of the sale when they adjourned to the court house yard to conclude the sale were made in the same tone of voice, one

as loud as the other, and that if Gullett was not hearing distinctly what took place and what was cried he had ample opportunity to get nearer to the crier, where he could hear without any difficulty.

The order and decree of the circuit court approving the report of sale are affirmed.                    *Decree affirmed.*